UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LARITA BURRELL, | ) | |
| | ) | Complaint #2014 CV-05127 |
| PLAINTIFF, | ) | |
| vs. | ) | Judge Robert M. Dow, Jr. |
| | ) | Courtroom 1919 |
| UNITED PARCEL SERVICE, CO. a For | ) | Magistrate Sheila M. Finnegan |
| Profit Corporation, incorporated in the | ) | Courtroom 2214 |
| State of Ohio, Registered to do business | ) | |
| in the State of Illinois, | ) | 219 South Dearborn |
| | ) | Chicago, IL. 60604 |
| DEFENDANTS. | ) | |

PLAINTIFF'S RESPONSE TO UPS' UNCONTESTED FACTS RE: SUMMARY JUDGMENT

NOW comes the Plaintiff, Larita Burrell, pursuant to The United States District Court, Local

Rule 56.1 for the Northern District of Illinois, responding to Ups' alleged Uncontested Facts,

stating that Burrell objects to Ups' position generally, and to the following:

Burrell objects to UPS' Undisputed Facts Under Local Rule 56.1

1. Under item #11, UPS alleged that Burrell testified in her deposition that UPS _never_

   assigned a route to a less senior driver to a less senior driver. If she did, she misspoke

   under the pressure of UPS' high powered attorneys. She could not say this _never_

   happened. She has only been at UPS since 2005. She does not have a complete idea what

   happened during and prior to 2005. UPS management assigned a route to a former

   employee Fabian who had less seniority than Burrell (Burrell Pl's Aff. item #46).

2. Under item #24 and #33, UPS claims that she had no sexual harassment from Adams before

1

July 2012 or after November, 2012. Again the pressure on her, a person who is not well educated, against a high powered lawyer in her first time deposition. She misspoke on many times. She never read the transcripts of her deposition. Defendant's representation is not true. Prior to the Defendant's motion for summary judgment, Plaintiff provided the Defendant with a copy of her diary, or journal for incidents on June 06, 2012, June 11, 2012, June 21, 2012, and June 25, 2012 (Burrell's Diary/Journals, Group Exhibit "C"). On June 06, 2012 Burrell bid on John Hughes' route on Friday, June 7, 2012. On Monday, June 10, 2015, Burrell came work to work Hughes' route. However, upon Burrell coming in to do John Hughes' route the one she was familiar with and she had bid on, Aldflo Flores had been sent out by UPS management to do Hughes' route.   She had checked the bid paperwork for Hughes' route and found that Flores had not bid to do Hughes' route. She raised issue with Flores being given Hughes' route although he never had bid on Hughes' route. She was told by UPS management that she had to do BoBo's route. She told UPS management that she was not familiar with BoBo's route but she wanted help doing the route. UPS management told her no. UPS' management knew that Burrell averred that she was not familiar with BoBo's route UPS management (Rachel) that she did not know BoBo's route, and she needed help to do BoBo's route. She asked UPS management could she and Morio go out and do BoBo's route together. UPS management told her no.  UPS management knew that Burrell did not know the route. UPS management told Burrell that she would have to do it by herself. Earlier UPS management had sent Banks ton and Mario out to do a route. But sent Burrell home rather than sending her with someone who may have been familiar with BoBo's route. Since she was in an "open status," she was not paid for that date. She and her children  went without things. On June 11, 2012, Rachel had Burrell on David Lewis' route. I

asked about John Hughes' route. Rachel got Chris, the manager. Burrell was trying to call the union steward when Chris started snapping at Burrell, stating "he did not care and that he was going to take Smins off her time because Burrell was trying to call the union steward. On June 21, 2012. Ms. Barnes from HR called Burrell. She asked Burrell lots of questions, "assessing what was going on at work." Burrell told her everything. Barnes promised that they were going to solve the problems of what was happening at UPS. It got worse. On June 21, 2012, UPS management put Burrell on Mario's route. It had 203 stops. UPS management sent her help, but they told the helping driver to only take 10 stops from her. With the 203 stops, Burrell did not finish until 8:30 p.m. (Diary, plus Pls. Aff. #18).

3. Under item #29, UPS said that she made no formal or informal complaint against Adams for July, 2012. If there were no formal or informal complaint, then why did Davis and Abe "counsel" him for what he said? Why did he apologize to me? Adams disputed this version. He said he did not apologize (Adams' Request to Admit, Item #_____). Whether Burrell issued a complaint or not, the fact is that what happened is not disputed by UPS. She did write statements and gave them to Rakow. This was done without legal counsel or help from her union. Again the leading of UPS' high powered attorney. Strangely, as far as known UPS never required Adams (male) to reduce his version to writing. In fact UPS management counseled Adams to bring his union with him to a hearing. But Burrell (female) was required to reduce my version to writing, otherwise she may have been charged with insubordination or something other violation. She was not cautioned by UPS to bring people to help her defend myself. Adams was. This was disparate treatment of Burrell (female) vs. Adams (male) by UPS management from Barnes who had knowledge to Krakow, etc.

4. Under item #45, she was criticized for not identifying witnesses at the time of each sexual harassment event. Again, she was and still is a young, inexperienced female in a male dominated society, without much education. But she at least knew that people who witnessed events are scared to come forward and she did not want to immediately expose them which would immediately traumatize them. She needed to talk to them first. She still maintain that co-workers avoiding her, including not talking to her. There will come a time, they will say that they were with her but were too afraid to step up. UPS got witnesses, although they may be reluctant witnesses: Marquita Barnes, Kimmel, Chris, Rachel, Ibrahim Hasan, Larry Davis, Joe Butler, Austin Little, Brian Hudson, Saundra Craig, etc.

5. Under item #54, it is very far fetched that Burrell could peek into Kimmel's mind as to what he claimed not or to know. Again, as a young female trying to answer hard question from UPS' high powered lawyer, in response to items #55-66, Flores failed to bid and he should not have been given the route. Burrell did bid. She should have gotten the route. As to #67-72, on November 19, 2012, she gave Barnes a doctor's note where she was grounded from working. She had not been cleared by her medical team to return to work but she and her babies and I were hurting so badly, she should not have but had to come back to work in mid January, 2013. Calculate the number of days. You'd calculate 50+ days off ill? Plus from the trauma she endured she could not come to work everyday in UPS' work environment. The 50 days that Kimmel alleged was wrong. Burrell did not have 50 days of unexcused absences.  Kimmel was way, way off base. It is verily believed that he acted after conferring with someone higher up in UPS.

6. Also, UPS management assigned Mr. Fabian to a route and he was a less senior worker

4

than me for route assignments. (Pls. Aff. item #46).

7. Consistent with the union representative John Seibert's spreading the word and vilifying Burrell and alienating her from her co-workers, frequently she would walk up while co-workers may be conjugating and they would disperse or walk away in the opposite directions of her. It was a widespread rumor that no one wanted to work or be seen with her (Pls. Aff. #23). Three persons, and others that she is currently at a loss to recall their names who do *not* go out of their way to avoid her as if she had the plague, namely: Larry Davis, Saundra Craig and Brian Hudson, who she count as some of her witnesses, among others. Also, contrary to Ms. Barnes' representations, "*she and I did discuss co-workers not wanting to work with me or to be affiliated with me,*" (see Diary). Burrell was advised that the term "ostracized" better fits this description. She was of the opinion that this could affect UPS' work environment and productivity.

8. People must keep in mind that her witnesses are "*reluctant witnesses*" and are worried about their jobs and what is going to happen to them, contrary to the alleged UPS policy regarding retaliation against *"whistleblower" type* people, or people who stand up against a *"code blue"* of silence, or people who will stand up for what they may believe is right.

9. Burrell is honestly tired of drivers thinking they can talk to her in any way they please, as if this is suppose to be UPS' work environment. She didn't want anyone to talk to her as if she were a whore, which some co-worker has labeled her. It was very hurtful and not true. (see her written versions to Krakow and see her Diary).

10. Ms. Barnes' and other UPS people assert that the impact from Michael Adams' sexual harassment acts were not *material harm* towards Burrell. Neither are Burrell, her medical team faking her trauma (see her partial Medical Record). Adams' acts, supported by UPS

management, caused. her medical situation. Her medical team is not faking her medical condition, nor are they liars. In the year 2015, given UPS' argument for summary judgment being traumatized by another's acts does not rise to the level of "material harm?" What if one were to walk in women's shoes, or your wife or daughter walk in a woman's shoes? How can one agree with the standard UPS cites to determine material harm? Just as in earlier times blacks were not considered person, so today Blacks *may* be seen as persons, instead of less than a person. So do we revisit the level necessary for to be "material harm" to women to matter.

11. Around July, 2012, Adams expressed upset feelings for her *working* "Reyes'" Package Driver route, who worked a regular, permanent. Reyes' route was not a *Swing* route.

12. While  Burrell was nearby and close enough to plainly hear Michael Adams approach their supervisor Larry Davis, about Burrell working the Reyes route, in effect saying to Mr. Davis: "you're taking her (meaning me, Larita Burrell) too personal .. you're messing around with her," (Pls. Aff., #7).

13. Mr. Davis brought this to his supervisor Abe, and took Adams into "Abe," Ibrahim Hasan's office, and Burrell was advised by Mr. Davis that they counseled Adams for his, unwarranted, sexual comments. (Aff.#8).

14. When Adams came out of the office, Adams apologized (but Adams' Request to Admit #____, he denied this) to Burrell for his unwarranted sexual harassing comments and promised not to cause any more sexual, harassing comments. Despite the trauma, hurt and uncomfortable feelings he caused, Burrell did her best to let it go; and did not take the matter further to issue a written complaint. (Aff.#9).

15.  Then Burrell told Mr. Davis and Abe to keep Adams away from her. They promised to

6

do so and neither would assign Adams and her to work deliveries, etc. together.

16. Larry Davis was transferred. He came back recently. (Aff.#10-11). (Aff.#12).

17. Later in 2012, Abe was replaced by Paul Rakow as UPS Business Manager for this unit.

18. Subsequently Burrell worked being a combination of a Loader and a Substitute Driver,

19. In the interim Burrell was advised by a co-worker to be very careful and watch myself with Mike Adams because he had exposed his private parts to a female co-worker while they were assigned together for deliveries and pick ups. (Aff.#14).

20. Adams' reputation gave Burrell a very chilling, frightening effect of whom and what she was up against. (Aff. #15).

21. On or about November 7, 2012, contrary to Abe's and Larry's promises not to put her with Adams, Rakow had them parried together to do Kauagos' route. Once she was scheduled for a half day. After about four hours of the paring with Adams, Adams commented in the presence of Joe Butler, Austin Little, Brian Hudson and perhaps other co-workers, in effect: "if I was a couple of years younger, you'd be sprung on me." Later that same day he saw Burrell talking to another guy and after she got back in the UPS' truck to do the route, he stated in effect: "Don't be too easy … Don't give it up so easy." Burrell was horrified and scared. She contacted Larry Davis and asked him to pick me up and take me back to Jeff Street; and relieve her from duty. He did. She went home frightened, humiliated and visibly shaken from Adams' unwanted sexual harassments. (Aff.16).

22. On or about November 14, 2012, in front of the University of Illinois Center ("UIC") at work, Burrell was walking past Adams, and in the presence of Joe Butler, Austin Little, Brian Hudson, Saundra Craig, and perhaps other co-workers, Adams grabbed and

7

touched Burrell's right hip where her pouch was laying at and it was attached to her body where he tried snatching her dyad out of her pouch. This was very offensive, scary, humiliating and visibly shook her. (Aff.#17).

23. At another moment, Adams told her that she needed to learn other routes. She agrees with this, but will reject being trained by Adams. She had asked UPS management, Rachel, UPS manager to par her with Mario to learn some additional routes. Rachel denied to give me assistance. She told Burrell that she had to go on the routes by myself. Before this occurred, she had pared Bankston and Mario together and sent them out as a team. This was a clear indication and evidence of co-workers' unwillingness to work with Burrell. This kind of attitude harms UPS productability. (Aff. #18).

24. She told Mr. Rakow about the incidents. He directed her to put them in writing. She put it in writing and gave Rakow a copy of her written statement. She gave him another statement that was prompted by her inability to sleep at approximately 1:45 a.m.; but she never saw or knew if Rakow required Adams to reduce his versions of the events to writing. Burrell thought this was disparate and discriminatory (AFF.#19-20). Does UPS permeate and violate its own alleged Professional Conduct and Anti- Discrimination policy?

25. Rakow reviewed her documents and provided these complaints to Ms. Marquita Barnes of. Human Resources ("HR"). HR of UPS was aware of UPS' disparate, discriminatory practice against Burrell. (Aff. #20).

26. Barnes claimed that since Burrell was out due to a medical illness beginning on November 19, 2012, she ruled that the allegations against Adams were not substantiated. Barnes knew Burrell would not be attending any meeting given she had a doctor's note

8

grounding Burrell, but Barnes made a decision against Burrell. UPS did not require a written statement from Adams, but required one from Burrell but not a written statement from Adams; Barnes did not ask for a representative to appear on Burrell's behalf to deliberate in an attempt to substantiate the charge against Adams. Barnes knew that she would be absent, she decided against Burrell. At these proceedings UPS produced no written disposition of their alleged "remedial action." (Aff. #21).

27. Burrell timely took these incidents to her local union representative, Michael Simmons. He brushed her off and took the position supporting Adams by jumping to Adams' defense. (Aff. #22).

28. Burrell remembered that her co-worker Terrell Washington, a 705 Teamster Representative, advising her that Mike Simmons' union supervisor, John Seibert advised him "to stay away from her... everyone was saying that she is crazy." (Aff. #23).

29. While Burrell was close enough to see and in hearing proximity to the group of: Joe Butler, Austin Little, Brian Hudson and Michael Simmons while they laughed and talked at UPS about the social events that Michael Simmons, Joe Butler, Austin Little, Brian Hudson participated in these social events sponsored and provided by Simmons (Aff.#24)

30. After about November 16, 2012 Burrell was convinced that her suspicion was confirmed. She knew that since they were social buddies and friends, Simmons was not going to represent her fairly in any dispute between Adams and her. She filed claims with the National Labor Relations Board ("NLRB") against her union for falling to fairly represent her. NLRB accepted the union's defense. (Aff.#224).

31. Burrell was convinced that she would not receive fair treatment from anyone, including UPS. This reality was crushing. It became more difficult for her to go to work at UPS.

She felt, and still feels that everyone was against her. She cried a lot, including while she was by herself, inside her UPS truck. She I was so stressed that she had to go to the hospital. They gave her medications for anxiety and depression. She never recalled ever crying before any client. But clients detected something was not right and kept asking her if she were okay. She never gave them a negative response about her situation. (Aff. #25).

32. Due to the stress and trauma from Adams, picking up and delivering packages it became more mentally and physically difficult for Burrell. (Aff.#27).

33. On or about November 16, 2012 Barnes called her and apparently heard her daughter's prayer in leaving her the message on Burrell's answering machine about my meeting with her regarding the incidents, which Barnes had set for November 19, 2012. (Aff. #28).

34. On November 19, 2012, Burrell came to the "Jeff Street" location with her doctor's statement that grounded her from working at UPS until further notice of her medical situation and she gave it to Barnes.  (Aff. #28).

35. During her stretch of being on sick leave from UPS, it became more stressful because UPS would not pay her for time off and she could not make ends meet with her and her small children.

36. At a relevant time, Burrell talked with Ms. Barnes about her and her health and small children's financial and mental situation. Barnes was aware of Burrell's illness. Barnes insisted that Burrell was expected and was well enough to come back to work at UPS. Burrell's mental and physical predicament would not permit her to return to work. Barnes asked should Burrell be transferred to deal with the situation with Adams. Burrell declined and told her that it would not be fair to move her, the victim of Adams' sexual

10

harassments that were the main sources of her illnesses, the pain on her small children, and her financial situation. (Aff. #31).

37. Her stress and anxiety grew larger. Partially due to UPS not paying her for being off work due to illness. Burrell was unable to provide food, shelter, and the necessary things to sustain life for herself and her babies. The holidays were coming up and Burrell was not able to get things for her children, especially Christmas plus other holidays. Given her religious practice, it was especially hurtful for other children to have things but hers had to go without. She applied for food stamps for her children, but was denied assistance. She was required to produce proof that she was not working. Barnes refused to give her proof that Burrell had not been working. She applied for workman's compensation and was denied it. She called and borrowed money and got assistance from her family to survive. She could not pay legal fees for representation of my claim against UPS and Michael Adams before the Illinois Department of Human Rights, fees and filings in this case. She became more stressed out; could not sleep; could not pay rent for herself and her children. (Aff. #32).

38. When Burrell first met and talked with Ms. Marquita Barnes, she was very sweet and nice. She talked about religion and God. It seemed as if she saw her as religious. After learning more about her and her denials to her, it became clear that she saw Burrell as religious and weak. Barnes was not sincere. Burrell knew she realized that she could not call on Barnes for assistance. (Aff. #33).

39. Burrell could not keep depending on her family to fully assist her. So, although she knew that she was not well enough to return to work at UPS, she returned to work in January, 2013 without her medical team's approval. (Aff. #34).

40. In returning to work at UPS, there were lots of times Burrell was on an "open status," which is a term that was widely used in their line of work. Any truck driver would understand what you refer to when you use the term "open status." The same understanding should come from any supervisory staff at UPS. Dave Kimmel was aware of the term "open status." Otherwise him in his position is questionable that says that there is no such term and the people he supervises in the industry are aware of the term but he, as a supervisor says that there is no such term When Burrell made a bid on a route. UPS management Kimmel gave it to Aldolfo Flores although he did not bid on that route. Burrell knew this because she checked the bid paperwork. The issue with this arrangement was not whether he had more seniority than her. He did. But if he did not bid on this certain route and Burrell did bid on that certain route, she should have gotten that route. She did not get that route. Because she was on an "open status" she was sent home which carried with it no pay for the day. This greatly impacted and caused great harm to her and her children's traumatic and financial problems. (Aff. #35).

41. Also, Barnes asserted that UPS did not accuse Burrell of being on unauthorized leave. Neither UPS nor Burrell can verify Barnes' assertion. Employees are not normally allowed to examine their files. Copies of this document were not to be found. UPS claims that there was no material harm because UPS withdrew the written warning. Once it was issued it became part of a *lingering litany* of negatives impacting against Burrell and her children. (Aff. #36).

42. Espinoza wanted to leave early, so he recommended to Kimmel to have Burrell do the UIC route. Adams intervened and he asked Kimmel to assign another co-worker to the route so Burrell would not get the UIC route. It is true that Adams had no power to assign

who was to do the route, but he thought he did. Neither Adams, Burrell, nor UPS management was qualified nor had the capacity to peek into the state of Espinoza's mind to conclude that Adams could not influence Kimmel or Espinoza. (Aff. #37).

43. On the one hand Kimmel claimed that Burrell controlled her own work assignments. But on the other hand he claims to be the Dispatcher that assigned people to work places. It can not be both. Either he was in charge of where people worked or the employees choose their work places. Kimmel was not truthful. Kimmel failed to follow the bid process when Burrell made a bid for a route on Friday, June 06, 2012. Flores did not bid, but Kimmel gave the route to Flores. Kimmel was further dishonest in deceptively stating that Burrell was absent 50 times as his reason for giving her a discipline. Kimmel knew that Burrell gave Barnes her doctor's note grounding her from work starting November 19, 2012 until about mid January, 2013; _calculate the days._ Burrell was so traumatized by Adams' and others' actions and statements that she was also out on other medical leaves. Worse was Kimmel's statement at para.17 that he had no interest in harming me. Kimmel was retaliating against Burrell. Barnes, Kimmel and others claim that there was no material harm. See the tip of the iceberg, in Burrell's partial medical record. No material harm?\ (Aff. #38).

44. Burrell did not grieve UPS management's violation of the rules of not providing her the route that she bid on which was given to Flores, a non bidder for that route, because of the bad history and experience with the UPS union that collected Burrell's union dues thru payrolls. (Aff. #39).

45. Contrary to what Saenz, Kimmel and others said, the Collective Bargaining Agreement between UPS and Local 705 did not give UPS authority to choose an employee with more seniority to bump another employee who had bid on a route, when the employee

13

with the greater seniority had not bid on that route. Burrell's issue has nothing to do with whether or not she bid to become a permanent driver. This dispute alone as to whether the 705/UPS Agreement gives reasons to deny summary judgment. (Aff. #40).

46. Frequently the lingering effect of Adams' and others' comments and acts and failure to properly act, put her in a tailspin, especially since it appears that the system was taking Adams' sexual harassments as amounting to nothing and they were not a big deal (he had not stopped since day one as he promised me, Larry Davis and Abe in July, 2012 that he would make no more sexual harassment remarks to Burrell) as suggested in UPS' motion for Summary Judgment. He only got a slight tap on the wrist, counseling. Burrell doesn't want other women to go through what she has been subjected to. From Adams and others actions Burrell still get very depressed. She has problems sleeping. All she wants to do is go to work to do her job, but the work environment keeps her from performing at a higher level. She should not have to keep working like this.

47. Defendants have not produced a scintilla of evidence for a summary Judgment. This includes but is not limited to in Plaintiff's browsing over 184 detailed pages of the Labor Management Agreement could there be found where the agreement was followed in UPS management could bump Burrell, who had bid for the route, for Flores, who may have had seniority over Burrell, But he never bid as he was required to do. Likewise none of the Defendant's people: Barnes, Chris, Rachel, Saenz, Kimmel, Krakow, or others put in any affidavit such a rule to bump Burrell. Last but not least, additionally the Defendants put in motion to require Plaintiff to sift through another 100 pages, with numerous columns on each page regarding UPS' massive GTS system that had nothing to do with this case. As great as their system was, it showed nothing in terms of Burrell's or anyone

14

else's Management by Objectives to do the required work to be held accountable and graded upon. It appears to attempt to lay the foundation to fire Burrell. With this more than 285 pages, it may very well be bad faith on UPS' part, without any comments or belief that UPS' attorneys suggested this to UPS. See *Nuzzi vs. St. George Co. School Dist. #258,* 688 F. Supp. 2d 815 (C.D. Ill., 7th, 2010). Plaintiff presents various issues of material facts needing a trial. *Butcher v. United Elec. Coal Co.,* 174 F.2d 1003 (C.A., 1997) where Plaintiff survives if there is any issue of material facts.

For the above reasons, the following relief is requested from the Court:

A. Deny UPS' Summary Judgment.

B. Grant Burrell leave to submit a motion to strike part, if not all of UPS' motion

C. Such other relief as may be fair, apropos and equitable

Respectfully submitted,

___/s/Robert L. Anderson, Esq.  for___
Larita Burrell, Plaintiff

Robert L. Anderson, Esq.
for Plaintiff Larita Burrell
175 W. Jackson Ste. #2275
Chicago, IL. 60604
(312) 427-3536
Attorney #0051322/21846

15

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LARITA BURRELL, | ) | |
| | ) | Complaint #2014 CV-05127 |
| PLAINTIFF, | ) | |
| vs. | ) | Judge Robert M. Dow,  Jr. |
| | ) | Courtroom 1814 |
| UNITED PARCEL SERVICE, CO. a For | ) | Magistrate Sheila M. Finnegan |
| Profit Corporation, incorporated in the | ) | Courtroom 2214 |
| State of Ohio, Registered to do business | ) | |
| in the State of Illinois, | ) | 219 South Dearborn |
| | ) | Chicago,  IL. 60604 |
| DEFENDANTS. | ) | |

<u>NOTICE OF FILING AND SERVICE OF RESPONSE TO SUMMARY JUDGMENT MOTION</u>

TO:
Quarles & Brady LLP
c/o William A. Walden, Esq.
c/o  Jeffrey S. Piell, Esq.
300 N. LaSalle St., Ste. #4000
Chicago, IL. 60664
Jeffrey.piell@quarles.com
William.walden@quarles.com


Be advised that on November 13, 2015 the Plaintiff e-filed the herein Response to the

Defendant's Motion for Summary Judgment with the United States District Court, and a copy

of the same to the above attorneys of record for UPS.

Respectfully submitted,

    /s/Robert L. Anderson, Esq.  for
Larita Burrell, Plaintiff


Robert L. Anderson, Esq.
for Plaintiff Larita Burrell
175 W. Jackson Ste. #2275
Chicago, IL. 60604
(312) 427-3536
Attorney #0051322/21846

16