**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LARITA BURRELL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-5127 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant United Parcel Service, Inc.'s motion for summary judgment [21]. For the reasons set forth below, Defendant's motion [21] is granted.

**I.    Background**

**A.    Statements of Fact**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements, construing the facts in the light most favorable to the nonmoving party. Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The rule permits a movant to file up to 80 separately-numbered statements of undisputed facts. L.R. 56.1(a). The party opposing the motion for summary judgment is required to file and serve "a concise response to the movant's statement that shall contain * * * a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b). The opposing party is also entitled to file up to 40 separately-numbered

material facts that require the denial of summary judgment, which the movant can then address in a concise response. L.R. 56.1(a), (b).

"Compliance with local rules like Rule 56.1 ensures the facts material to the issues in the case and the evidence supporting such facts are clearly organized and presented for the court's summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). The Seventh Circuit "has repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions." *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015) (citing *Patterson v. Ind. Newspapers, Inc.,* 589 F.3d 357, 360 (7th Cir. 2009)). District courts are not obliged to scour the record looking for factual disputes. *Id.* (citing *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir. 1994)).

Here, Defendant complied with Local Rule 56.1 by submitting 73 separately-numbered statements of undisputed material fact along with its motion for summary judgment and its memorandum in support of that motion. [See 21–24, 26.] Plaintiff, who has been represented by counsel throughout this litigation, failed to comply with the local rule. Specifically, Plaintiff did not file a supporting memorandum of law, as required by Local Rule 56.1(b)(2).[1] Instead, despite having approximately four months to file its response, Plaintiff ultimately filed (1) a "response to [Defendant's] uncontested facts re: summary judgment," and (2) a declaration. Plaintiff's response to Defendant's statement of undisputed facts begins by objecting, in a lengthy narrative format, to various allegations in Defendant's statement of facts (*i.e.*, paragraphs 11, 24, 29, 33, 45, 54–72). [See 40, ¶¶ 1–5.] For the most part, Plaintiff does not include "specific references to

---

[1] In the final paragraph of Plaintiff's response to Defendant's Local Rule 56.1 Statement of Undisputed Facts, Plaintiff argues that "Defendants have not produced a scintilla of evidence for a summary [j]udgment," including several case citations. [See 40, ¶ 47]. This is the only paragraph in all of Plaintiff's submissions that contains any legal argument.

the affidavits, parts of the record, [or] other supporting materials relied upon" in objecting to Defendant's statements, as required by L.R. 56.1(b)(3)(B).[2] In addition, Plaintiff's objections contain argument and information not responsive to or extraneous to the paragraph to which Plaintiff is responding. Because Plaintiff's responses are improper, Defendant's fact statements (paragraphs 11, 24, 29, 33, 45, 54–72) will be admitted. See, *e.g.*, *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003)); *Nehan v. Tootsie Roll Industries, Inc*., 54 F. Supp. 3d 957, 960–61 (N.D. Ill. 2014) ("To the extent that [plaintiff] fails to effectively dispute facts properly set forth and supported by [defendant], those facts are deemed admitted for the purposes of this motion."). Further, because Plaintiff did not object to Defendant's remaining statements (paragraphs 1–10, 12–23, 25–28, 30–32, 34–44, 46–53, and 73), and because Defendant's statements are properly supported by citations to the record, they are also deemed admitted for purposes of this motion.

The remaining portion of Plaintiff's response to Defendant's statement of undisputed facts [see 40, ¶¶ 6–46] appears to be Plaintiff's statement of additional material facts that require denial of summary judgment, per Local Rule 56(b)(3)(C). The Court assumes this based on the fact that many of the paragraphs include citations to Plaintiff's declaration or exhibits attached to that declaration (all but paragraphs 11, 17–18, and 35). However, because Plaintiff must support *all* alleged facts with admissible evidence, paragraphs 11, 17–18, and 35 are stricken. See L.R. 56.1; *Curtis*, 807 F.3d at 219. As to the remaining statements, the Seventh Circuit "do[es] not allow litigants to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony." *United States v. Funds in Amount of $100,120*, 730 F.3d 711, 718 (7th Cir.

---

[2] The only exception is Plaintiff's objection to paragraphs 24 and 33 of Defendant's statement of facts in which, at the end of a page-and-a-half narrative, she cites to her "Diary, plus Pls. Aff. #18." [40, ¶ 2.] However, paragraph 18 of Plaintiff's Declaration [40-1, at 4–5] and Plaintiff's "diary" [40-2, at 27–29], are non-responsive to the statements of fact in Defendant's paragraphs 24 and 33, as is Plaintiff's page-and-a-half narrative objection [40, ¶ 2].

2013). Thus, to show a dispute of material fact, Plaintiff's affidavit testimony must actually contradict a material fact as presented by Defendant while not contradicting Plaintiff's sworn deposition testimony, or must have some independent evidentiary basis besides Plaintiff's affidavit testimony.

While it is not the Court's job to sift through the record to find evidence to support a party's claim, see *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006), the Court will endeavor to take all of Plaintiff's alleged factual statements into account when assessing Defendant's arguments. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (making clear that, although district courts have discretion to require strict compliance with Rule 56.1, "[i]t does not follow * * * that district courts cannot exercise their discretion in a more lenient direction: litigants have no right to demand strict enforcement of local rules by district judges"). That being said, the Seventh Circuit is "highly critical of efforts to patch up a party's deposition with his own subsequent affidavit." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995). Thus, to the extent that Plaintiff's post-deposition affidavits conflict with deposition testimony in the record, the assertions in the affidavits will be disregarded.[3] See *Janky v. Lake Cnty. Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009) (quoting *Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 592 (7th Cir. 2007) ("[L]itigants cannot create sham issues of fact with affidavits that contradict their prior depositions.").

---

[3] For example, Plaintiff says in her response that on or about November 14, 2012, "[Michael] Adams grabbed and touched [her] right hip." [40, ¶ 22.] But when discussing the November 14, 2012 incident in her deposition, Plaintiff testified that Mr. Adams did not touch her on November 14, 2012 or on any other occasion. [41-2, at 9–10.] Similarly, Plaintiff says in her response that several individuals witnessed Mr. Adams make an allegedly harassing comment to Plaintiff on November 5, 2012 [see 40, ¶ 21], but in her deposition Plaintiff gave sworn testimony that Mr. Adams made the comment while they were out on the delivery route and that there was nobody present who might have heard the comment. [41-2, at 7–8.] Because Plaintiff's allegations in her response contradict her sworn testimony, they cannot form the basis of a disputed issue of material fact. See *$100,120*, 730 F.3d at 718.

**B.**     **Facts**

**1.**     **Plaintiff's Employment at UPS**

Plaintiff began working at UPS in September 2005 at the company's Jefferson Street facility in downtown Chicago. More specifically, Plaintiff worked out of the University Center of the Jefferson Street facility, which is one of the four package centers at that location. In October 2011, Plaintiff became a full time package car driver at that facility—a position that she still holds today. At all times relevant to this motion, Plaintiff has been a member of the International Brotherhood of Teamsters Union Local 705, and the collective bargaining agreement between Local 705 and UPS governs the terms of her employment.

The University Center at the Jefferson Street UPS facility handles approximately 80 delivery routes. There are two types of delivery drivers at the facility: (1) permanent drivers, who are assigned a specific delivery route on a permanent basis (*i.e.*, until he or she surrenders the route or retires), and (2) "swing" drivers, who cover delivery routes when permanent drivers are absent. By choice, Plaintiff has always been a swing driver. Swing drivers obtain routes through a weekly bid process, wherein they bid on and receive routes based on driver seniority. Plaintiff testified that there were always routes available at the University Center for her, given her seniority, to bid for and receive a route.

**2.**     **Sexual Harassment**

Plaintiff complains of three instances of sexual harassment, all involving her coworker Michael Adams. Mr. Adams began working as a full-time delivery driver at UPS's Jefferson Street facility in 2006. Because he started as a full-time driver before Plaintiff, he was the more senior driver and thus had priority over Plaintiff with respect to driving routes. But Mr. Adams has never held a management position at UPS, and he has never had the authority to change any

aspect of Plaintiff's employment (*e.g.*, hire her, fire her, discipline her, change her pay, determine her work assignments, etc.).

According to Plaintiff, the first instance of harassment occurred in July 2012, when Plaintiff overheard a conversation between Michael Adams and a Supervisor named Larry Davis. Mr. Adams was complaining to Mr. Davis because Plaintiff was assigned to a route that he wanted. Plaintiff describes the conversation as follows:

> [Michael Adams] got upset because I was going to do a route that he wanted to do. So he told Larry, you know, Davis, that he's taking me too personal, like, you messing with her or something. * * * [H]e said something about y'all, like we sleeping together.

[24-4, at 33.] In other words, Mr. Adams implied that Plaintiff only got the route in question because she was sleeping with the supervisor. Plaintiff says that after Mr. Adams made this comment, "Larry [Davis] instantly took him to the office with [Manager Ibrahim Hasan]. And [Adams] came back and apologized, so [she] left it alone." [*Id.*]

The second and third instances of harassment occurred four months later in November 2012. In the first instance that month, Plaintiff and Mr. Adams were on a delivery route together, and as Plaintiff was stepping off of the truck, Mr. Adams "just made a little remark, like, 'If I was younger, you'd be sprung on me.'" [24-4, at 36.] Plaintiff gave him a look, and he apologized. [*Id.*] Then later that day, Mr. Adams "s[aw] someone trying to talk to [Plaintiff] on the route and he was, like, 'Don't be too easy. Don't give it up too quick,' like." [*Id.*] Plaintiff "kind of like brushed it off." [*Id.*] The second incident occurred shortly thereafter (Plaintiff said it was the following day in her deposition, but other evidence indicates that it was a week later), while at the Jefferson Street facility, Mr. Adams was upset with Plaintiff about a route assignment, and Plaintiff "told him, like, 'Stop worrying about me.'" [*Id.*] In response, Mr. Adams "was like, 'Man, I can tell you easy.'" [*Id.*, at 37.]

To be clear, Plaintiff is not alleging sexual harassment by any other UPS employees other than Michael Adams [see 24-4, at 27–28], and Plaintiff confirmed at her deposition that the three aforementioned incidents in July and November 2012 were the only instances of sexual harassment that she experienced:

> Q. I want to list out all the instances where Mike Adams allegedly harassed you. * * * Two incidents. First being July 2012?
>
> A. And November. It was two incidents in November.
>
> Q. Two incidents in November?
>
> A. Yes.
>
> Q. And then one incident in July 2012?
>
> A. Yes.
>
> Q. And no other incidents besides those three incidents?
>
> A. No.
>
> Q. So nothing before July 2012, nothing after November 2012?
>
> A. No, nothing after November. Everything happened in November and in July.[4]

[24-4, at 32.]

---

[4] Defendant relied on this excerpt from Plaintiff's deposition to support its Local Rule 56.1 factual assertion that "Burrell states that she suffered no harassment before July 2012 or after November 2012." [23, ¶ 24.] As mentioned above, Plaintiff objected to Defendant's factual statement in her "response to [Defendant's] uncontested facts re: summary judgment," citing paragraph 18 of her declaration and her "diary" in support of her objection. [See 40, ¶ 2.] While Plaintiff is not permitted to create a factual dispute via affidavit testimony that contradicts prior sworn testimony, see *$100,120*, 730 F.3d at 718, Plaintiff's supporting materials—*i.e.*, paragraph 2 of Plaintiff's objection [40, ¶ 2], paragraph 18 of her declaration [40-1, at 4–5], and Plaintiff's diary [40-2, at 27–29]—do not actually contradict Defendant's factual statement because they do not reference any additional instances of sexual harassment (they discuss various instances where Plaintiff was dissatisfied with her route assignments). To the contrary, Plaintiff attached a copy of her IDHR complaint to her declaration [40-2, at 2–6], and that document corroborates Plaintiff's deposition testimony that she only experienced three instances of sexual harassment occurring in July and November 2012.

It is also worth noting that Plaintiff alleges that "[s]he misspoke many times" at her deposition because she "is not well educated" and because she was intimidated by the "high powered lawyer" in the room. This is not persuasive. Plaintiff—who has been represented by legal counsel throughout this litigation, including at her deposition—had the opportunity to read and correct her deposition transcript, see Fed. R. Civ. P. 30(e), but elected not to. In addition, Plaintiff's attorney asked Plaintiff questions during her deposition [see 41-2, at 13], and presumably could have used his questions to clarify any misstatements.

UPS has a Professional Conduct and Anti-Harassment Policy that says that "UPS will not tolerate harassment of any employee by anyone for any reason." The policy prohibits "unprofessional and discourteous actions, even if those actions do not constitute unlawful harassment." It instructs any employee who "witnesses objectionable conduct [to] report it immediately to a supervisor or manager, a Human Resources representative, the Human Resources manager, the Employee Relations manager, or the UPS Help Line." UPS posted this policy in the breakroom area at the Jefferson Street facility. Plaintiff reviewed the policy in 2005, 2010, and twice in 2011, and she testified in her deposition that she understood the policy and that if she experienced harassment, discrimination, or retaliation, she could go to a member of UPS's management for help. [See 23 ¶¶ 15–17.]

On November 14, 2012, Plaintiff told UPS Business Manager Paul Rakow at the Jefferson Street facility that Michael Adams had made inappropriate comments to her. This marked the first time that Plaintiff had reported any alleged wrongdoing to UPS management. In response, Mr. Rakow instructed Plaintiff to write a statement documenting her allegations. Plaintiff did so, and gave Mr. Rakow a letter the following day that described the three incidents of sexual harassment discussed above. [See 24-15, at 7–9.] After reviewing the letter, Mr. Rakow interviewed Mr. Adams (*i.e.*, the alleged harasser) about the allegations, and Mr. Adams denied making those comments. Nonetheless, Mr. Rakow told Mr. Adams that the allegations were serious and that he would thoroughly investigate Plaintiff's claims. He told Mr. Adams that he would be forwarding the information to the Human Resources ("HR") Department and informing the union, and that Mr. Adams should expect to be questioned about the complaint in the future. Mr. Rakow documented this conversation in a memorandum dated November 15, 2012 [24-15, at 11], and he sent a copy of Plaintiff's letter to UPS HR Manager Marquita Barnes.

On November 16, 2012, Plaintiff gave Mr. Rakow a second letter, explaining that she was "mentally affected by this situation." [See 24-15, at 13–14.] Plaintiff did not include any additional allegations of harassment in this second letter, but she did describe an interaction that she had the day before with a union representative named Michael Simmons who questioned her about her complaint to UPS management, telling her that "it's [her] word against Mike Adams' word." [*Id.*] Mr. Rakow forwarded Plaintiff's letter to Ms. Barnes in the HR Department. Mr. Rakow then spoke to Mr. Adams again about the incident, and again Mr. Adams denied all of the allegations. Also on that day, Ms. Barnes from the HR Department interviewed Plaintiff about her claims. She then interviewed Mr. Adams (his third interview about the incident), who again denied all of the allegations. Plaintiff did not identify any witnesses to the harassment in either of her two written statements or in any of her interviews with Mr. Rakow or Ms. Barnes, and so Mr. Rakow and Ms. Barnes did not interview any other UPS employees about Plaintiff's complaints. Plaintiff did not discuss her complaints with any UPS employees other than Mr. Rakow and Ms. Barnes. Plaintiff did not file any grievances with her union related to Mr. Adams' comments, despite her acknowledgement that she was entitled to do so.

After completing their investigation, UPS's HR Department concluded that it had no basis to take any action against Mr. Adams other than counseling him on how to treat his coworkers. Ms. Barnes offered Plaintiff the opportunity to relocate to a different facility, but Plaintiff declined. Plaintiff testified at her deposition that after Mr. Rakow and Ms. Barnes spoke with her and Mr. Adams about the situation, she did not experience any additional instances of harassment from Mr. Adams or any other UPS employees.

### 3. Retaliation

In December 2012, Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR"), alleging that Mr. Adams sexually harassed her. Plaintiff alleges that between December 2012 and May 2013, UPS management—specifically UPS On Road Supervisors David Kimmel and Steve Szo—retaliated against her for filing the charge with the IDHR. Plaintiff—who did not take any depositions in this case [see 41-1]—does not have any evidence indicating that either Mr. Kimmel or Mr. Szo was aware that she filed a charge with IDHR when they allegedly retaliated against her.

Plaintiff alleges that David Kimmel retaliated against her on three or four occasions (she does not recall when) by denying her requests to drive particular routes and giving those routes to drivers with more seniority instead, even though (at least on some occasions) those drivers did not bid on the routes in question. That being said, Plaintiff acknowledges that Mr. Kimmel had discretion under the collective bargaining agreement to assign routes based on driver seniority, and Plaintiff testified that whenever her requests for particular routes were denied, they routes always went to a more senior driver:

> Q. Was there any instance when this -- where this happened where the driver that got the route you wanted had less seniority than you?
>
> A. No.
>
> Q. So the drivers always had more seniority than you who ultimately got the routes?
>
> A. Yes, but if they didn't bid, then they not -- you know, the person who did bid on the route [is] supposed to get the route.

[See 24-4, at 65.] Mr. Kimmel stated in an affidavit that during the time period in question, Plaintiff was very selective about the routes she was willing to drive, and often would bid on only one or two routes per week. Mr. Kimmel said that if Plaintiff did not receive her preferred

routes, she would volunteer to go home, rather than accepting a less-preferable route that was available.

Plaintiff also alleges that Mr. Kimmel retaliated against her by writing her up for attendance infractions. On April 24, 2013, Mr. Kimmel wrote in Plaintiff's employee record: "Final warning on [Plaintiff] for call-in on 4/23. Instructed her that she was not approved for FMLA and she has called in over 50 times in last year." [See 24-18.] The phrase "call-in" describes an instance where an employee calls management before the start of his or her shift to indicate that he or she is going to miss work that day, and if the employee fails to provide documentation justifying the absence, it is considered an unexcused absence. Mr. Kimmel testified at his deposition that he gave Plaintiff the warning because of her poor attendance and her unexcused absence on April 23, 2013, and Plaintiff testified that when she spoke with Mr. Kimmel about the warning, he told her that it resulted from her attendance. Plaintiff had nine call-ins between January 16, 2013 and, at the time of the April 23 warning, all of her absences were unexcused.[5] Plaintiff testified that the April 24 warning did not cause any suspension, demotion, termination, loss in pay, loss of benefits, or any other change in her employment. Plaintiff did not file any complaints or grievances regarding retaliation by Mr. Kimmel.

Similar to her claim against David Kimmel, Plaintiff alleges that Steve Szo retaliated against her on at least one occasion by rejecting her bid for a route and giving the route to a driver with more seniority who did not bid on the route:

> I placed a bid to do John Hughes's route, and that follow -- I -- we have to have -- bid before Friday. Well, Friday is the last day, and then on Monday, that's when we do the routes. And I had more seniority to do the route, but Adolpho, he had more seniority than me, too, but he didn't bid. He never wrote his name up on the sheet, and they still put him on the route for the week.

---

[5] In May 2013, UPS retroactively approved Plaintiff for an intermittent leave of absence from April 22, 2013 to May 8, 2013 and rescinded the April 24 warning because Plaintiff produced Family and Medical Leave Act paperwork regarding her attendance.

[24-4, at 67–68.] Again, under the governing Collective Bargaining Agreement, Mr. Szo had discretion to assign a more senior driver to available routes. Plaintiff did not file any grievances or lodge any complaints with UPS management regarding this alleged retaliation. Plaintiff did not file any complaints or grievances regarding this alleged retaliation by Mr. Szo.

In all instances where either Mr. Kimmel or Mr. Szo denied Plaintiff her preferred route, Plaintiff always had the option of accepting an alternative, non-preferred route.

> Q. So was there ever an instance where there was just no routes available at all for you to be able to drive?
> A. No.

[24-4, at 23; see also Decl. of David Kimmel, 24-3, ¶ 16 ("In 2013, however, there were available routes that [Plaintiff] could have driven, given her seniority, even if her preferred routes were not available.").]

## II.    Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chicago*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

III.    **Analysis**

A.      **Sexual Harassment**

Plaintiff claims that Defendant violated Title VII by subjecting her to a hostile work environment based on sexual harassment. Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination in employment: "It shall be an unlawful employment practice for an employer * * * to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The purpose of this provision as it relates to discrimination on the basis of sex is to prevent "'disparate treatment of men and women in employment,'" regardless of its form. *Oncale*, 523 U.S. at 78 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Therefore, whenever "'the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.'" *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

To establish a *prima facie* case of hostile work environment sexual harassment, an employee must establish that (1) she was subjected to unwelcome harassment (*e.g.*, unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature); (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and to create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007) (citing *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007)); *Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 645 (7th Cir. 2005).

### 1. Severe and Pervasive

In order to rise to the level of actionable workplace harassment, "the complained-of conduct must have been sufficiently severe or pervasive to have altered the conditions of her employment such that it created an abusive working environment." *Passananti v. Cook County*, 689 F.3d 655, 667 (7th Cir. 2012) (citing *EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012)). Factors in this assessment include the severity of the allegedly discriminatory conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance. See *Gentry v. Export Packaging Co.*, 238 F.3d 842, 850 (7th Cir. 2001), quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1145 (7th Cir. 1997) ("Title VII is not directed against unpleasantness per se but only * * * against discrimination in the conditions of employment." (quoting *Carr v. Allison Gas Turbine Div.*,

*Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994))). Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment. See *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "A plaintiff pursuing a hostile work environment claim must show that his or her work environment was both subjectively and objectively offensive; 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Gentry*, 238 F.3d at 850 (quoting *Faragher*, 524 U.S. at 787).

Here, Defendant argues that Plaintiff cannot establish that the complained-of conduct was objectively pervasive or severe. The Court agrees.

There is no bright-line rule for what constitutes "pervasive" harassment. In *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007), the court concluded that the plaintiff's allegations of "at least" 18 sex-based comments made over a 10-month period, coupled with allegations that similar comments were made "very often," constituted pervasive harassment. *Boumehdi*, 489 F.3d at 786. However, in *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002), a total of eight gender-based comments over the term of the plaintiff's employment did not constitute pervasive harassment. The *Patt* court also held that "the impact of * * * 'second-hand' harassment is obviously not as great as harassment directed toward [plaintiff] herself." *Id.* (citing *Adusumilli*, 164 F.3d at 361–62); see also *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430–31 (7th Cir. 1995) (holding that a "handful of comments spread over months" did not add up to sexual harassment).

Here, Plaintiff identified four allegedly harassing comments made during three separate conversations, one of which did not involve Plaintiff. The first comment came in July 2012,

when Plaintiff overheard Michael Adams conversing with UPS Supervisor Larry Davis. The remaining three comments occurred during two interactions between Plaintiff and Michael Adams in early November 2012. Plaintiff and Michael Adams have worked at the same UPS facility since UPS hired Mr. Adams in May 2006 (and apparently still work together), but Plaintiff does not identify any other harassing comments made by Mr. Adams during this period. Whether described as three incidents over five months or three incidents over approximately ten years, these are still isolated incidents. This conclusion stems both from the low number of allegedly harassing statements over a lengthy period of time as well as the fact that one of the comments came from a conversation that Plaintiff overhead (*i.e.*, "second-hand" harassment).

As to the severity of the alleged harassment, the Seventh Circuit has delineated two types of allegations, explaining that on one side of the spectrum there are sexual assaults, other physical contact for which there is no consent, uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, and pornographic pictures; and on the other side lies conduct that generally does not create a hostile work environment, such as "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)). "[T]he threshold for plaintiffs is high, as '[t]he workplace that is actionable is one that is hellish.'" *Whittaker*, 424 F.3d at 645 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)).

The complained-of conduct here does not rise to the "hellish" standard required to be actionable under Title VII. To recap, Plaintiff alleges that in July 2012 she overheard a conversation between Michael Adams and Supervisor Larry Davis, wherein Mr. Adams was upset because Plaintiff was assigned a route that he wanted, and so Mr. Adams told Supervisor

Davis that he was "taking [Plaintiff] too personal," and that Supervisor Davis was "messing with [Plaintiff] or something," with the implication being that Supervisor Davis gave Plaintiff the route in question because Mr. Davis and Plaintiff were "sleeping together." And in November 2012, while Plaintiff and Mr. Adams were out on a delivery route, Mr. Adams "made a little remark, like, 'If I was younger, you'd be sprung on me.'" [24-4, at 36.] And later during that same route, after watching Plaintiff talk to another man, Mr. Adams told Plaintiff, "Don't be too easy. Don't give it up too quick, like." [24-4, at 36.] And then, later that month, Mr. Adams said to Plaintiff, "Man, I can tell you [are] easy." [24-4, at 37.] Plaintiff does not allege any physical contact between her and Mr. Adams.

As the Seventh Circuit said in *Whittaker*, "th[is] behavior, while questionable, was relatively isolated, and alone not actionable." *Whittaker*, 424 F.3d at 645. This is because "relatively isolated instances of non-severe misconduct will not support a claim of a hostile environment." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993). Indeed, as the Seventh Circuit detailed in *Whittaker*, relatively isolated behavior far worse than Plaintiff's has been found inactionable. For example, in *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993), the defendant allegedly "asked [the plaintiff] for dates, called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area and attempted to kiss her in a bar," and "may have twice attempted to kiss her in the office." Nonetheless, the Seventh Circuit held that these incidents were "relatively isolated" and thus failed to meet the standard for actionable sexual harassment. *Id.* Similarly, in *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995), over the course of seven months the plaintiff's employer called her a "pretty girl," made grunting noises as she left his office, told her that his office did not get "hot" until she stepped into it, joked that "all pretty girls [should] run

around naked" in the office, likened her to Anita Hill in acknowledging his tendency to share comments of a sexual nature with her at the office, and once made gestures suggesting masturbation while conversing. Despite all this evidence of "vulgar," "coarse," and "boorish" behavior, the Seventh Circuit held that "[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Id.* at 431.

So too here. While harassing comments of any form or frequency are inappropriate in a workplace, the complained-of conduct here is less severe and less pervasive than conduct that has failed to trigger liability under Title VII. Even viewing the facts in the light most favorable to Plaintiff, the comments made by Michael Adams to Plaintiff do not constitute severe and pervasive harassment. Accordingly, Defendant is entitled to summary judgment on Plaintiff's sexual harassment claim.

### 2. Harassment by a Coworker

Alternatively, Defendant argues that it is entitled to summary judgment on Plaintiff's sexual harassment claim based on Plaintiff's inability to establish employer liability. Under Title VII, different standards of employer liability apply depending on whether the alleged harasser is the victim's supervisor or a coworker. See *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013) (affirming the Seventh Circuit's approach to distinguishing between supervisors and coworkers for purposes of hostile work environment claims under Title VII). An employer is strictly liable for harassment by a supervisor. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008) (citing *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006)). A "supervisor" for Title VII purposes is "not simply a person who possesses authority to oversee the plaintiff's job performance, but a person with the power to directly affect the terms and conditions of the plaintiff's employment." *Id.* (citation omitted). This power includes generally

"the authority to hire, fire, promote, demote, discipline or transfer." *Id.* (citing *Rhodes v. Illinois Dep't. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004)).

Here, the alleged harasser, Michael Adams, has never held a management position at UPS, and he has never had the authority to change any aspect of Plaintiff's employment (*e.g.*, hire her, fire her, discipline her, change her pay, determine her work assignments, etc.). Thus, Mr. Adams was Plaintiff's coworker, not her supervisor.

An employer is liable for harassment by a coworker only if it was negligent in discovering or remedying the harassment, that is, if the employer "knew or should have known about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004); *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004) ("Put differently, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.").

Defendant cannot be liable for the harassment in question here because it took prompt and reasonable steps to remedy the harassment once it was on notice. The first alleged instance of harassment occurred in in July 2012, when Plaintiff overheard a conversation between Michael Adams and Supervisor Larry Davis in which Mr. Adams implied that Plaintiff and Mr. Davis were sleeping together. Plaintiff testified in her deposition that after Mr. Adams made this comment, "Larry [Davis] instantly took him to the office with [Manager Ibrahim Hasan]. And [Adams] came back and apologized, so [she] left it alone" [24-4, at 33], and Plaintiff did not experience any further harassment for four months. In other words, UPS management responded immediately to the incident and took prompt and appropriate corrective action that was reasonably likely to prevent the harassment from recurring.

The remaining instances of harassment occurred in early November 2012. UPS management first learned of the alleged harassment on November 15, 2012, when Plaintiff verbally notified manager Paul Rakow. Mr. Rakow, acting in accordance with UPS's Professional Conduct and Anti-Harassment Policy, (1) immediately instructed Plaintiff to draft a letter memorializing her allegations, (2) drafted a memorandum of his own noting the complaint, and (3) enlisted the assistance of Marquita Barnes from UPS's Human Resources Department. Over the next 48 hours, Mr. Rakow and Ms. Barnes conducted an investigation of Plaintiff's claims that included discussing the situation with Plaintiff and interviewing Mr. Adams three separate times. After completing the investigation, UPS's Human Resources Department concluded that it had no basis to take any action against Mr. Adams other than counseling him on how to treat his coworkers. Ms. Barnes offered Plaintiff the opportunity to relocate to a different facility, but Plaintiff declined. After Mr. Rakow and Ms. Barnes spoke with Plaintiff and Mr. Adams about the situation, Plaintiff did not experience any additional instances of harassment from Mr. Adams or any other UPS employees. In short, UPS responded immediately to Plaintiff's complaint and conducted a thorough and effective investigation that prevented any future instances of harassment. Accordingly, Defendant cannot be held vicariously liable for the alleged harassment, and Defendant is entitled to summary judgment on Plaintiff's sexual harassment claim on this basis as well. See *Williams*, 361 F.3d at 1029.

**B.    Retaliation**

Under the anti-retaliation provision of Title VII, it is unlawful for an employer to discriminate against an employee for opposing an unlawful employment practice or for making a charge, testifying, assisting, or participating in a Title VII investigation, proceeding, or hearing. *Brown*, 499 F.3d at 684 (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove retaliation by

using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006) (quotations and citations omitted). "Under the direct method, a plaintiff must show that (1) [s]he engaged in statutorily protected activity; (2) [s]he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Id.* at 663 (quotations and citations omitted). Alternatively, under the indirect approach, in order to establish a *prima facie* case for retaliation, the employee must show that (1) after filing a charge, the employee was subject to adverse employment action; (2) at the time, the employee was performing her job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action. See *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). "'If the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action.'" *Tomanovich*, 457 F.3d at 663 (quoting *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998)). Then, if the employer presents evidence of a non-discriminatory reason for its employment action, "'the burden shifts back to the plaintiff to demonstrate that the employer's reason is pre-textual.'" *Id.* (quoting *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)).

### 1.        Adverse Employment Action

Defendant argues that Plaintiff's retaliation claim fails under both the direct and indirect methods because she cannot establish that she suffered an adverse employment action as a result of filing her charge with the IDHR. Plaintiff alleges that she suffered a reduction in hours because she was denied her preferred driving routes. Defendant says that while Plaintiff was denied her *preferred* driving routes, there were always other routes available that Plaintiff could have accepted, but she elected to go home rather than accepting these alternate routes.

Adverse employment actions "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir.2011). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Smart*, 89 F.3d at 441. To be actionable, there must be a "'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Bell v. Envtl. Prot. Agency*, 232 F.3d 546, 555 (7th Cir. 2000) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *Lewis v. City of Chicago*, 496 F.3d 645, 653–54 (7th Cir. 2007) ("[T]he critical issue [is] whether the alleged discrimination caused a material change in the employment relationship.").

Denying Plaintiff her preferred routes does not constitute an adverse employment action because the alternate routes available to Plaintiff offered her the same number of hours and the same pay as did her preferred routes—*i.e.*, there is no evidence that the alternate routes were objectively less desirable than Plaintiff's preferred routes. And the Seventh Circuit has held that "if personal preference alone [were] sufficient to establish adverse employment action, the objective requirement for such a finding would effectively be eliminated." *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 729–30 (7th Cir. 2009) (plaintiff's "personal preference" in teaching twelfth grade instead of seventh grade was insufficient to establish adverse employment action); see also *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1070 (7th Cir. 2012) ("[Plaintiff's] subjective belief that seventh grade is so much more difficult to teach than third

grade such that being assigned to seventh grade altered her work environment is not sufficient to make that assignment a materially adverse employment action."). By contrast, in *Alexander v. Casino Queen, Inc.*, 739 F.3d 972 (7th Cir. 2014), an employer's reassignment of a waitress to a different area of the casino floor *did* constitute an adverse employment action because certain areas of the casino floor yielded higher tips than others—*i.e.*, certain assignments were objectively more lucrative than others. *Alexander*, 739 F.3d at 980. Here, however, there is no evidence that Plaintiff's desired routes yielded higher returns or were in any measurable way objectively superior to the routes that were available to her.

Plaintiff's claim is akin to a "reassignment of job duties" retaliation claim, even though, as a swing driver, the very nature of Plaintiff's position implied a degree of uncertainty as to which route she would drive in any given week. Even so, the Supreme Court has noted that "[t]o be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.''" *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). Here, even if one were to consider Defendant's actions as a reassignment of job duties (*i.e.*, that Plaintiff was "reassigned" from her preferred delivery routes to other less-desired routes), there is no evidence—other than Plaintiff's articulated preferences—indicating that Plaintiff's preferred routes differed in any material way from the available routes that she refused to accept. *Burlington*, 548 U.S. at 71 (adverse employment action existed where plaintiff's reassigned duties were "by all accounts more arduous and dirtier," and plaintiff's prior assignment "was objectively considered a better job"); see also *Duncan v. Thorek Memorial Hosp.*, 784 F. Supp. 2d 910, 920 (N.D. Ill. 2011) (assignment of a less desirable work shift with

longer hours was not an adverse employment action where the transition did not involve a decrease in pay or rate of benefit accrual). Again, Plaintiff's subjective beliefs as to which delivery routes were more desirable, absent any evidence showing that the available routes were objectively inferior, are not sufficient to establish that Plaintiff suffered a materially adverse employment action.[6]

Plaintiff also alleges that Mr. Kimmel retaliated against her by writing her up for attendance infractions. But Plaintiff testified that this warning did not result in any suspension, demotion, termination, loss in pay, loss of benefits, or any other change in her employment. See *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 n.31 (7th Cir. 2012) (three written warnings regarding absenteeism and placement of employee on probationary status did not constitute an adverse employment action because a reasonable employee would not be discouraged from filing a Title VII complaint as a result of such actions); *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 613 (7th Cir. 2001) (oral or written reprimands do not constitute adverse employment actions unless accompanied by "tangible job consequences"); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) (same); *Johnson v. Johnson & Johnson*, 67 F. Supp. 3d 1001, 1010 (N.D. Ill. 2014) (attendance warning did not constitute adverse employment action because it did not result in any tangible consequences).

---

[6] Alternatively, Defendant notes that Plaintiff repeatedly testified at her deposition that she could not recall when any of these retaliatory events occurred (*i.e.*, when she was denied her preferred routes) and that she had no evidence to establish the dates and times of any of these incidents. Indeed, "conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 726 (7th Cir. 2004) (plaintiff failed to provide "the times, dates or places" of alleged racial harassment to support his hostile work environment claim). Here, Plaintiff did not take any depositions and it is unclear what, if any, discovery she conducted. It is not surprising, then, that she is unable to corroborate her testimony with specific dates and times of the alleged retaliation (information that should be readily available through traditional methods of discovery). The result is that Plaintiff's conclusory allegations about these alleged instances of retaliation "are not sufficient to avoid summary judgment," *id.*, thus providing another ground for ruling in Defendant's favor on this claim.

Because an adverse employment action is a prerequisite to stating a prima facie case of discrimination under both the direct and indirect methods, and because the Court has concluded that Plaintiff did not suffer an adverse employment action, the Court must grant summary judgment in Defendant's favor.

### 2. Causation

Defendant also argues that Plaintiff cannot establish the causation element of the direct method of proving retaliation: *i.e.*, that a causal connection exists between Plaintiff's charge filed with the IDHR and the allegedly-adverse employment actions that followed. Plaintiff can rely on either direct or circumstantial evidence to show that Defendant's decision to assign Plaintiff's preferred routes to more senior drivers was motivated by Plaintiff's filing of her charge with the IDHR. See *Harper*, 687 F.3d at 307.

Evidence of retaliation is direct when, "if believed by the trier of fact, [it] will prove the particular fact in question without reliance on inference or presumption." *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714 (7th Cir. 1999) (internal quotation marks omitted). "Because direct evidence * * * essentially requires an admission by the employer," such evidence "is rare." *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir. 2008). And here, Plaintiff admitted that she has no direct evidence that either Mr. Kimmel or Mr. Szo was aware of her complaint to the IDHR or that their actions were motivated in any way by Plaintiff's complaint.

Circumstantial evidence of retaliation, on the other hand, may include "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi*, 489 F.3d at 792; see also *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) (holding that "*together with other facts*, [suspicious timing]

can sometimes raise an inference of a causal connection" (emphasis added)). Here, the only circumstantial evidence supporting a causal link between Plaintiff's complaint and the alleged adverse employment actions is a temporal one (*i.e.*, Plaintiff filed her charge in December 2012 and was allegedly retaliated against between December 2012 and May 2013). However, "[i]t is well established that 'mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue.'" *Harper*, 687 F.3d at 308 (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)); see also *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone * * * does not support a reasonable inference of retaliation * * *.").

Plaintiff has not presented any additional circumstantial evidence beyond the temporal relation between the complaint and the alleged adverse action that might support a causal link between the two. In fact, the circumstantial evidence points in the other direction, as UPS Supervisors such as Mr. Kimmel and Mr. Szo had discretion under the governing collective bargaining agreement to assign routes based on seniority, and Plaintiff admitted that in every instance where she did not receive a particular route that she bid on, the route went to a more senior driver. More to the point, the reason that Plaintiff experienced a reduction in hours is because *she* volunteered to go home, rather than accepting delivery routes other than the few select routes on which she bid.[7] [See 24-4, at 23 (Q. "So was there ever an instance where there was just no routes available at all for you to be able to drive?" A. "No.").]

---

[7] The circumstantial evidence surrounding Mr. Kimmel's written warning to Plaintiff regarding her attendance also cuts against Plaintiff's argument that the harassment was caused by her complaint to the IDHR. Specifically, at the time the Mr. Kimmel issued the warning (April 24, 2013), Plaintiff already had amassed multiple unexcused absences in that calendar year (she had nine call-ins between January 16, 2013 and April 23, 2013). The reasonable inference, then, is that the cause of the warning was Plaintiff's poor attendance record, not her complaint to the IDHR.

In short, a temporal proximity alone, absent any other indicia of retaliation, is insufficient to satisfy the causation element in a direct retaliation claim. See, *e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (holding that a seven-week interval between a sexual harassment complaint and plaintiff's termination "does not represent that rare case where suspicious timing, without more, will carry the day"); *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) (holding that timing was not enough, on its own, to create a jury issue on retaliation where the plaintiff had threatened to file an EEOC complaint three months and then again six weeks before she was fired).

### 3. Indirect Method

The Court already concluded that Plaintiff cannot succeed under the indirect method of proving retaliation because Plaintiff cannot establish that she suffered an adverse employment action. Defendant also argues that Plaintiff cannot succeed under this method because (a) she was not meeting Defendant's legitimate expectations and (b) she was not treated less favorably than other similarly situated employees who did not engage in such protected activity.

As to the former, Defendant says that Plaintiff was not meeting her employer's legitimate expectations because of her poor attendance. Defendant claims that attendance is particularly important for a mail carrier such as Defendant, as it is incumbent upon Defendant to ensure that there are sufficient drivers to cover every delivery route on every day without exception. When Mr. Kimmel warned Plaintiff about her attendance on April 23, 2013, he noted that she had called in (*i.e.*, not come to work) over 50 times in the past year. Plaintiff had nine call-ins between January 16, 2013 and April 23, 2013 alone. See, *e.g.*, *Contreras v. Suncast Corp.*, 237 F.3d 756, 760–61 (7th Cir. 2001) (proper attendance is an implicit expectation of every employer); *Lewis v. Caterpillar Inc.*, 367 F. App'x 683, 685 (7th Cir. 2010) ("Failure to arrive

for work on time—or at all—is not satisfactory performance. Employers need to know who will work so that they can plan production schedules (or arrange for substitutes).”); *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 491 (7th Cir. 2014) (same); *Winsley v. Cook County*, 563 F.3d 598, 605 (7th Cir. 2009) (same). Based on Plaintiff's excessive absences during the relevant time period, coupled with the importance of regular attendance for mail carriers, the Court concludes that she was not meeting her employer's legitimate expectations regarding attendance.

As to the latter, Plaintiff failed to identify a single employee who was similarly situated to her yet treated more favorably. To the contrary, Defendant elicited testimony that all route assignments were based on seniority, and that she never lost a route to a coworker with less seniority. See *Winsley*, 563 F.3d at 606 (“Without identifying a similarly situated employee, [plaintiff] could not make out a prima facie case of retaliation under the indirect method. Thus, her retaliation claim fails.”); *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007) (same); *McKenzie v. Milwaukee County*, 381 F.3d 619, 626 (7th Cir. 2004) (same).

The Court agrees with Defendant that Plaintiff was not meeting her employer's legitimate expectations regarding attendance, and that Plaintiff failed to identify any similarly situated employees who were treated more favorably, and thus Plaintiff cannot make out a claim for retaliation under the indirect method for these reasons as well.

## IV.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [21] is granted. Judgment will be entered in favor of Defendant.

Dated: February 16, 2016

_____

Robert M. Dow, Jr.
United States District Judge